# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BRIAN VANDERHEYDEN, individually and on his marital community's behalf;<br><br>                    Plaintiff,<br><br>v.<br><br>ADT COMMERCIAL, LLC.<br><br>                    Defendant. | **No. 2:22-cv-01024-TL**<br><br>PLAINTIFF BRIAN VANDERHEYDEN'S DECLARATION SUPPORTING HIS MOTION FOR PARTIAL SUMMARY JUDGMENT |

I, BRIAN VANDERHEYDEN, hereby declare as follows:

1. I am over the age of 18 and otherwise competent to testify.

2. The statements in this Declaration are based on my personal knowledge.

### _Background of my Employment with Defendant_

3. In March 2007, I became employed by Detection Logic as an engineering manager, and I would design low voltage fire suppression systems that Detection Logic would sell to customers. I was paid salary as an exempt employee.

4. Detection Logic was sold to United Technology Corp in 2011, and I remained in the same position and was paid salary as an exempt employee, but my employer became Chubb Fire and Security.

5.   In or around 2012, Chubb Fire and Security changed its name to UTC Fire and Security.  The entity remained the same, and I remained in the same position and continued to be paid a salary as an exempt employee.

6.   In or around late 2012, UTC Fire and Security was sold to Comvest in April 2012, and I became employed with Red Hawk Fire & Security, LLC. ("Red Hawk").  Red Hawk continued to pay me salary as an exempt employee.

*The Red Hawk Bonus Program's Genesis*

7.   On July 21, 2017, I received an employment offer from Red Hawk's competitor, SimplexGrinnel ("Competitor").  The Competitor incentivized me to switch my employment from Red hawk to it by including me in its nondiscretionary Annual Incentive Performance Program, which would pay me a bonus based on my productivity and efficiency.  The Competitor's offer is attached as **Exhibit 1.**

8.   On August 2, 2017, I told Red Hawk's Operations and District General Manager, then Jeremy Munson ("Munson"), about the Competitor's offer, and that I was considering switching employers from Red Hawk to the Competitor.  Jeremy Munson was my direct supervisor at Red Hawk to whom I reported, and he was the person who established and determined my compensation as a Red Hawk employee.  My email to Mr. Munson informing him about the Competitor's offer is attached as **Exhibit 2.**

9.   In what Red Hawk described as an effort to retain me as one of its valuable employees, Red Hawk offered to prospectively modify the compensation it would pay me if I remained a Red Hawk employee and did not accept the Competitor's offer.  Red Hawk offered to change my employment status as an exempt employee who received a salary, but

no overtime pay to a nonexempt hourly employee at an agreed-upon hourly rate who would

receive overtime pay if I worked more than 40 hours per week.  I determined this change in

status given the hours I worked would be better for me financially.

10. In addition, Red Hawk offered to pay me a nondiscretionary bonus on each project

where the total contract price was $25,000 or more.  The nondiscretionary bonus was equal to

$7 for each hour for which I designed a fire suppression and alarm system that was below the

estimated design hours upon which Red Hawk's contract with the customer was based.  Red

Hawk's offer to modify my compensation is attached as **Exhibit 3**.

11. Here is an example of how the nondiscretionary bonus was to be calculated and paid.

Assume Red Hawk sold a fire suppression and alarm system to a customer and the contract

price qualified for a bonus.  The contract price that Red Hawk agreed to with the customer

was based on an estimated 100 hours of design time.  I then designed the system in 75 hours.

In that event, I would be entitled to a nondiscretionary bonus equal to $7 for the difference

between the number of estimated design hours upon which the contract price was based (100)

and the actual design hours I spent designing the system (75).  In this example, I would be

entitled to a nondiscretionary bonus equal to $7 X 25 hours or $175.

12. I submitted bonus calculations to Red Hawk after Red Hawk sent the final invoice to

the customer and Red Hawk had reasonable time to collect the final invoice from the

customer (approximately 60-90 days).  The bonus was not, however, dependent upon the

customer paying Red Hawk.

13. After I submitted bonus calculation to Red Hawk, Red Hawk could audit my bonus

calculations and communicate any discrepancy to me within a reasonable time.  Red Hawk

was to pay me my nondiscretionary bonus after it completed its audit and we resolved any

discrepancy Red Hawk claimed based on its audit.  Hereafter, I will refer to Red Hawk's

bonus program as the "Red Hawk Bonus Program."

14. All projects for which the total contract price exceeded $25,000 that was not finally

invoiced to the customer as of the date the Red Hawk Bonus Program was instituted qualified

for the Red Hawk Bonus Program no matter when Red Hawk and its costumer entered into

their contract.

15. I accepted Red Hawk's offer to modify my compensation, and in consideration of Red

Hawk's offer, I remained a Red Hawk employee and forewent my opportunity to become

employed with the Competitor.  My acceptance of Red Hawk's offer is attached as **Exhibit 4.**

### *Implementing the Red Hawk Bonus Program*

16. On August 17, 2017, I emailed Red Hawk a list of the projects upon which I was

working when Red Hawk's Bonus Program was instituted.  My email identifying those

projects is attached as **Exhibit 5.**  Red Hawk has never objected to the list of projects I

supplied.

17. After Red Hawk instituted the Red Hawk Bonus Program, I had access to Red Hawk's

Work in Progress ("WIP") reports, and I could track the estimated design hours for each

project I worked on and the number of hours I spent designing that specific fire suppression

and alarm system.  I was, therefore, able to calculate the bonus to which I was entitled.

18. On April 6, 2018, I emailed Red Hawk an updated list of projects that I designed that

were eligible for the Red Hawk Bonus Program.  Red Hawk never objected to my April 6,

1

2    2018, list of projects that I claimed were eligible for the Red Hawk Bonus Program.  My

3    email is attached as **Exhibit 6**.

4        19. After I sent my April 6, 2018, email, and later in 2018, my access to Red Hawk's WIP

5    reports was discontinued by Red Hawk, and I was no longer able to track the relevant

6    information necessary to calculate my bonus.

7        20. On December 3, 2018, Red Hawk's parent company was acquired.  Red Hawk

8    remained the same entity, but its name was changed, and it is now called ADT Commercial,

9
10   LLC, which is the Defendant in this action.  For the purposes of continuity, I will continue to

11   refer to the Defendant as "Red Hawk" despite it changing its name.

12       21. On January 23, 2019, I emailed an updated list of projects to Munson, who had

13   become Red Hawk's Operations Manager after Red Hawk was acquired.  He was still the

14   supervisor to whom I reported and the person who established and determined my

15   compensation.  My email is attached as **Exhibit 7**.

16
17       22. Red Hawk responded to my January 23, 2019, email on August 13, 2019, and it agreed

18   to set up a meeting with me to discuss the issues I raised in my January 23, 2019, email,

19   which were related to the Red Hawk Bonus Program and the nondiscretionary bonus I had

20   earned and that I was going to earn.  Red Hawk's email to me is attached as **Exhibit 8**.

21       23. By September 9, 2019, Red Hawk had not set up the meeting with me that it had

22   agreed to set up.  I sent an email to Katie McKellar, who had recently become Red Hawk's

23
24   Operations Manager, to whom I directly reported at that time.  In my email I expressed my

25   frustration that Red Hawk was ignoring my emails and not setting up the meeting it promised

26   to set up.  My email is attached as **Exhibit 9**.

27

BRIAN VANDERHEYDEN'S DECLARATION SUPPORTING HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT – 5

24. Soon after I sent my September 9, 2019, follow up email to Red Hawk, I received an employment offer from Siemens, which was another Red Hawk competitor.

25. On September 23, 2019, I followed up with Red Hawk that notified it about the employment offer I had received from Siemens, and I again requested Red Hawk set up a meeting with me to discuss the Red Hawk Bonus Program and my ongoing concerns about my bonus.

26. Red Hawk responded to my September 23, 2019, email, and it set up a meeting to discuss the Red hawk Bonus Program that was to occur the following day.

27. Red Hawk met with me prior to September 30, 2019.  In attendance for Red Hawk were McKellar and Munson.  Munson was Ms. McKellar's direct supervisor to whom she reported.  Munson and McKellar were the people within Red Hawk that established my compensation as a Red Hawk employee at that time.

28. In the September 2019, meeting Red Hawk agreed to my project lists that I had provided, and it agreed to my bonus calculations that I had previously provided.  Red Hawk also agreed it would pay me by October 31, 2019, the bonus to which I was entitled (and claimed) for the qualified projects that I worked on in 2017 ( which included projects where contracts were signed in 2016 and 2015).  Red Hawk also agreed to pay me the nondiscretionary bonus I claimed for the projects I worked on and was able to track data for in the year 2018 (that I claimed) by December 31, 2019.

Red Hawk Modified my Compensation and the Red Hawk Bonus Program

29. In that September 2019 meeting, Red Hawk also agreed to modify my compensation as follows:

a.  To increase my wages to $115,000 annually based on 2080 annual hours and to continue to pay me as a nonexempt hourly employee;

b.  I would continue to participate in the Red Hawk Bonus Program; Project eligibility was redued to $20,000.

c.  The Red Hawk Bonus Program would be modified to include a nondiscretionary $2,500 incentive for each high-rise projects for which I designed a fire suppression and alarm system when the required permit was issued;

d.  Any high-rise project that was currently active would qualify for the modified Red Hawk Bonus Program and I would receive the $2,500 nondiscretionary incentive.  These still active high-rise projects for which I was entitled to the $2,500 nondiscretionary incentive included the Potala, Block 18, and Summit III projects, for which I have not been paid.

e.  The Red Hawk Bonus Program would be modified to pay me a nondiscretionary $5,000 incentive for the Seattle Arena project once the applicable permit was issued, which it was issued, but for which I have not been paid.

f.  The Red Hawk Bonus Program would be modified to pay me a nondiscretionary $5,000 incentive for the Seattle Arena project once the project was completed, which it was, but for which I have not been paid.  Completion was defined as the final sign off of the fire suppression and alarm system by the  Fire Marshall.

### *Red Hawk Reneges on its Promises to pay*

30. On September 30, 2019, I sent both Munson and McKellar an email that confirmed the modified compensation agreement to which Red Hawk and I agreed.  Red Hawk never objected to my September 30, 2019, email's contents or my recitations of the modified

compensation agreement that are set forth in that email.  My September 30, 2019, email is attached as **Exhibit 10.**

31. Red Hawk did not pay me the nondiscretionary bonus it promised to pay me for the projects I worked on in 2017 by October 31, 2019.

32. Red Hawk did not pay me the nondiscretionary bonus it promised to pay me for the of projects I worked on in 2018 by December 31, 2019.

33. In January 2020, I was disappointed by Red Hawk's failure to pay me the amounts it agreed to pay me in October and December 2019.  I confronted Red Hawk and Munson approved a $2,500 partial payout.  Munson sent an email on January 24, 2020, that approved a partial payout to me of $2,5000 for the bonus I had been claiming.  Munson's email approving the $2,500 payout is attached as **Exhibit 11**.

34. Red Hawk did not pay me the $2,500 partial payout it promised.

### *My Dealings with Red Hawk's Regional General Manager Erik Isakson*

35. In 2020 and before September 8, 2020, Red Hawk's new parent company that had acquired Red Hawk's previous parent company had replaced Red Hawk's management.  Red Hawk's new Regional General Manager was Erik Isakson ("Isakson").  Isakson became the person who approved changes to my compensation and payouts of monies I had earned.

36. On September 8, 2020, I emailed Munson and Isakson about the Red Hawk Bonus Program and explained my efforts to be paid the bonus I was owed and Red Hawk's failures to pay me promised amounts.  My email is attached as **Exhibit 12**.

*Red Hawk Unilaterally and Without Notice Changed my Compensation
by no Longer Paying me a $700 per Month Vehicle Allowance*

37. Prior to November 1, 2020, Red Hawk unilaterally changed my compensation without notice to me when it discontinued the $700 per month vehicle allowance that it had been paying me. I did not consent to this change in my compensation. It was a surprise to me, and I objected to Red Hawk. Red hawk agreed to reinstate my $700 per month vehicle allowance retroactive to November 1, 2020, but it never did.

*My Continued Dealings with Isakson*

38. By January 20, 2021, my Red Hawk Bonus Program concerns and my requests for my bonus to be paid were no longer being handled by Munson because he was no longer employed with Red Hawk. After Munson was no longer employed with Red Hawk, Isakson solely handled my bonus claims until Red Hawk replaced Munson with Tim Kudela ("Kudela").

39. On January 20, 2021, Kudela requested me to provide documentation to support the bonus I was claiming Red Hawk owed me pursuant to the Red Hawk Bonus Program. His email is attached as **Exhibit 13.**

40. On January 25, 2021, I emailed Kudela extensive documentation that supported my claim that Red Hawk owed me nondiscretionary bonus pursuant to the Red Hawk Bonus Program. My documentation, however, was limited and incomplete because my access to Red Hawk's WIP reports had been discontinued in 2018. My email is attached as **Exhibit 14**.

41. By February 15, 2021, I received no response from Kudela regarding my bonus claims. I emailed Kudela that same day to follow up on my January 25, 2021, email that I had previously sent her.  My email is attached as **Exhibit 15**.

42. By June 22, 2021, Kudela still had not responded to either my January 25, 2021, email or my February 15, 2021, follow up email.  On that day, I sent Kudela another follow-up email inquiring about Red Hawk's response to my bonus claims.  My email is attached as **Exhibit 16**.

### *Red Hawk Acknowledges Unpaid Bonus and Makes Partial Payment*

43. Between August 17 - 25, 2021, Kudela sent emails to Frank Visker, Red Hawk's Comptroller ("Visker"), and Red Hawk's Payroll administrator for the office in which I worked.   His email chain is attached as **Exhibit 17.**

44. In his emails, Tim approved an $18,356.63 (75%) partial payout of the bonus I was claiming for projects I worked on in 2017 that qualified for the Red Hawk Bonus Program.Tim also promised Visker would audit my bonus requests for those projects and Red Hawk would pay me any remaining bonus amounts that I was owed for those projects after Visker competed his audit. No further audit was completed as far as I am aware.

45. At that point, Visker had identified one minor discrepancy that I agreed should be changed.

46. Other than that one minor change, nobody at Red Hawk, including Isakson, Visker, Kudela, and Berkley, ever objected to the bonus calculations that I submitted.

### *Tim Kudela Becomes Operations Manager in 2021*

47. At some point in 2020, Red Hawk hired Tim Kudela ("Kudela") to fill the vacancy created when Munson was no longer employed at Red Hawk. Kudela was hired as the Operations Manager and reported to Isakson. After Kudela was hired, I reported to Kudela. Kudela could recommend changes to and payouts of my compensation, but they were subject to Isakson's approval.

### *Fed up, I Resign from Red Hawk*

48. As of November 9, 2021, Red Hawk had still not disclosed to me any further discrepancies in my bonus calculations or that it had completed its audit of my bonus calculations. Red Hawk had also not paid me the remaining bonus amounts that I had claimed for the 2017 projects and had not addressed my 2018 bonus calculations. Red Hawk had also not addressed my concerns over me not having access to Red hawk's WIP reports and me not having the ability to track the bonus to which I was entitled. Finally, Red Hawk had also not reinstated my $700 car allowance that it had agreed to reinstate.

49. Motivated primarily by Red Hawk's conduct described in this Declaration, on November 9, 2021, I announced my resignation from Red Hawk effective November 22, 2021, and I requested Red Hawk pay me all compensation that it owed me. My resignation letter is attached as **Exhibit 18.**

### *My Continued Efforts to get paid by Red Hawk*

50. After my resignation from Red Hawk became effective, I emailed Kudela and Isakson twice, and each time I demanded Red Hawk pay me the bonus to which I was entitled. My emails are attached as **Exhibits 19 and 20**.

51. Red Hawk was unresponsive, and I commenced this action.

BRIAN VANDERHEYDEN'S DECLARATION SUPPORTING HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT – 11

1

2      *Damages I can Prove Based on the Incomplete Information I was Able to Obtain*

3      52. Based on the information I was able to derive from the WIP reports that I had access

4      to prior to Red Hawk discontinuing my access to its WIP reports and my time sheets that I

5      supplied to Red Hawk as part of my job duties at Red Hawk, I am owed at least $40,549.87 in

6      nondiscretionary bonus for projects I worked on that qualified for the Red Hawk Bonus

7      Program.  My spreadsheet showing my bonus calculations that I supplied to Red Hawk while

8      I was employed there, and afterward in this litigation to justify my claims are attached as

9

10     **Exhibit 21.**

11     53. I also supplied Red Hawk and its counsel the underlying Red Hawk WIP reports that I

12     took screen shots of, and the time sheets I submitted to Red Hawk from which I derived the

13     figures on my bonus calculation spreadsheet.  Red Hawk, therefore, has the underlying data,

14     and has had it for months, so it has had the ability to verify the bonus calculations that I was

15     able to make.  Red Hawk has not revealed any discrepancy in my bonus calculations or any

16     inaccuracy in the figures I used in my bonus calculation spreadsheet.

17     54. Red Hawk's attorneys have claimed that the Red Hawk WIP reports contain

18     proprietary information that should not be disclosed in the public records.  I, therefore, have

19     not attached the Red Hawk WIP reports that I have in my possession; rather, I rely on the

20     summary of the information from those WIP reports that are on my spreadsheet the accuracy

21     of which Red Hawk and its counsel have and ample time to verify.

22     55. The $40,549.87 figure is just bonus.  It does not include the $7,500 in

23     nondiscretionary incentives Red hawk owes me for the three high-rise projects that I

24     identified I worked on that qualified for the incentive.  It also does not include the $10,000 in

25

26

27

BRIAN VANDERHEYDEN'S DECLARATION SUPPORTING HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT – 12

nondiscretionary incentives Red Hawk owes me for the Seattle Arena project. It does not include the $8,400 in vehicle allowance that Red Hawk owes me. Adding these amounts to the bonus amounts results in Red Hawk owing me at least **$66,449.87** in unpaid wages.

*<u>My Struggles to Obtain Further Information from Red Hawk</u>*

56. On December 29, 2022 (almost one year ago) I requested production from Red Hawk of further WIP reports and documentation so I cold complete my bonus calculations for projects I worked on since my access to Red Hawk's WIP reports were discontinued. My Request for Production is attached as **Exhibit 22**.

57. Despite the simplicity of my requests for production, Red Hawk objected to everything I requested. Its response to my requests for production are attached as **Exhibit 23**.

58. After my counsel met with Red Hawk's counsel Red Hawk started providing some discovery to me on April 25, 2023, and then further production on May 31, 2023.

59. On October 27, 2023, my counsel noted the FRCP 30(b)(6) deposition of Red Hawk's corporate representative(s) that was to occur on November 16, 2023, to obtain the information I needed to properly calculate the bonus Red Hawk owes me. My Notice of Taking Deposition is attached as **Exhibit 24.**

60. On November 8, 2023, Red Hawk's counsel objected to the topics I designated in my FRCP 30(b)(6) deposition. Its objections are attached as **Exhibit 25**.

61. I was able to take Isakson's FFRCP 30(b)(1) deposition on November 16, 2023. His Deposition Transcript is attached hereto as **Exhibit 26**. By separate Declaration, my attorney authenticates the deposition transcript as he was present for Isakson's deposition. It is attached to my Declaration for ease of reference.

62.  I also noted the FRCP 30(b)(1) deposition of Red Hawk manager Mike Cunningham ("Cunningham").  Unfortunately, Cunningham could not attend his deposition on the date scheduled, and it has been re-noted to occur on December 27, 2023.

63.  Red Hawk's and my attorneys met and conferred about Red Hawk's Red Hawk's objections to the topics I designated in my FRCE 30(b)(6) deposition notice.  They agreed, a and stipulated, that the discovery cutoff in this case be extended until January 14, 2024, to allow me to take Cunningham's FRCP 30(b)(1) deposition and Red Hawk's FRCP 30(b)(6) deposition to the extent I needed further deposition testimony after I deposed Isakson and will depose Cunningham.  Our attorney stipulation was approved by this Court in an Agreed Order entered on November 22, 2023.  *Dkt. No. 26.*

64. Finally, on December 12, 2023, almost one year after I made the request, Red Hawk sent me some of the information I requested they produce in my first request for production. Red Hawk produced a spreadsheet entitled AW Sage Data.  It is attached as **Exhibit 27.**

<u>*Additional Damages I am Able to Prove*</u>

65. Based on the RAW Sage Data Red Hawk finally produced on December 12, 2023, I have been able to calculate that Red Hawk owes me an additional $_____ in unpaid bonus that I earned while I was employed at Red Hawk pursuant to Red Hawk's Bonus Program.  A spreadsheet showing my calculations as to the additional bonus I have calculated is attached as **Exhibit 28**.

*My Concerns About the Information Red Hawk has Recently Provided*

66. Despite my receiving the RAW Sage Data Red Hawk provided, it appears to still be incomplete and in some respects inaccurate. I have explained some of the inaccuracies and incompleteness on the spreadsheet I attached as Exhibit 28.

I hereby declare that the foregoing is true and correct under the penalty of perjury under the laws of the United States.

Signed on December 21, 2023, in Mill Creek, Washington.

*BRIAN VANDERHEYDEN*

Brian VanDerHeyden

## CERTIFICATE OF SERVICE

I, Shiki Izuka, hereby certify that on December 21, 2023, I caused the foregoing instrument to be e-filed and served on the following via the method indicated below:

| | |
|---|---|
| Catharine Morisset<br>Ryan Jones<br>Fisher & Philips<br>Address: 1700 7th Avenue | Suite 2200 |<br>Seattle, WA 98101-4416<br>Email: cmorisset@fisherphillips.com;<br>rrjones@fisherphillips.com;<br>mrsmith@fisherphillips.com;<br>jmatautia@fisherphillips.com<br>Phone: (206) 693-5076<br>Attorneys for Defendant | ECF/E-service |

I certify that the foregoing is true and accurate.

Signed on this 21st of December 2023 in Bellevue, Washington.

*/s/ Shiki Izuka*

Shiki Izuka